# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Taron Colenburg,

                    Plaintiff,

                                      Civ. No. 08-4683 (RHK/FLN)
                                      **MEMORANDUM OPINION
                                      AND ORDER**

v.

STARCON International, Inc.,

                    Defendant.

---

Joni M. Thome, Clayton D. Halunen, Halunen & Associates, Minneapolis, Minnesota, for Plaintiff.

Kerry L. Middleton, Noah G. Lipschultz, Littler Mendelson, PC, Minneapolis, Minnesota, for Defendant.

---

      In this action, Plaintiff Taron Colenburg has sued his former employer, STARCON International, Inc. ("Starcon"), for discrimination and reprisal in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*, and termination in violation of the Minnesota Whisteblowers' Act, Minn. Stat. § 181.931 *et seq.* Presently before the Court is Starcon's Motion for Summary Judgment. For the reasons set forth below, the Court will grant the Motion.

## BACKGROUND

      Starcon is an Illinois company that provides maintenance work at oil refineries and chemical plants across the country. (Holznagel Dep. Tr. at 9-10.) One of Starcon's

clients is Marathon Ashland Petroleum Company ("Marathon"). (Colenburg Dep. Tr. at 124.) Starcon provides maintenance services at Marathon's St. Paul Park, Minnesota refinery. (Id.)

Colenburg, who is African American, applied for a position with Starcon in November 2005. (Lipschultz Aff. Ex. F.) He was hired to work as a "B mechanic apprentice"/scaffold builder at the St. Paul Park location. (Colenburg Dep. Tr. at 105, 110-11, 136-37.) Although he was living part-time in Woodbury, Minnesota, at the time he was hired, he still received mail and lived part-time in Detroit, Michigan. (Id. at 111-13.) In July 2006, he signed a relocation-assistance agreement with Starcon, pursuant to which the company provided him $12,000 to assist in "relocating" him from Michigan to Minnesota. (Id. at 111-16; Lipschultz Aff. Ex G; Walsh Aff. ¶ 9.) The agreement provided that he would be liable to Starcon for the $12,000 "[i]n the event [he did] not work for a minimum of two (2) years at the Marathon site where [he] accept[ed] employment." (Lipschultz Aff. Ex. G.)

During his tenure, Colenburg received mostly favorable reviews and was steadily promoted through the ranks, from B mechanic to scaffold B builder to scaffold A builder by late 2007. (Colenburg Dep. Tr. at 136-37, 160, 163-66.) His salary also increased steadily. (Walsh Aff. Ex. 1.)[1] He was given the opportunity to participate in various

_____

[1] On two occasions, Colenburg's hourly salary was temporarily raised while he worked on a "turn around" project, after which his salary was returned to its previous level. (Walsh Aff. ¶¶ 6-8 & Ex. 1.) In his deposition, Colenburg appeared to contend that these decreases in pay were "demotions" in retaliation for his complaints about a defective piece of equipment in 2006. (Colenburg Dep. Tr. at 158, 288-90.) In his brief, however, he does not rely on those so-called

training programs, many of which were geared toward his ultimate goal of obtaining a "planner" position.  (Colenburg Dep. Tr. at 121-22, 135–40; Holznagel Dep. Tr. at 49-50.)[2]

In January 2008, scaffold supervisor Carlos Huerta[3] informed Starcon that he had a family emergency and would be unable to come to work for a week.  (Holznagel Dep. Tr. at 53-59; Colenburg Dep. Tr. at 198-204.)  Kris Olsen, a recent Starcon hire who was working as a scaffold B builder, approached Huerta and stated that he would be willing to take over Huerta's duties in his absence.  (Olsen Dep. Tr. at 74; Holznagel Dep. Tr. at 59; Lipschultz Aff. Ex. K.)  Holznagel, who knew that Olsen had expressed an interest in management and had recently been discharged from a leadership position in the Army after two tours of duty in Iraq, discussed the idea with Huerta and Gregg Kobe, Holznagel's supervisor.  (Olsen Dep. Tr. at 73; Holznagel Dep. Tr. at 59-60.)  Ultimately, Holznagel agreed to let Olsen serve as Huerta's replacement until he returned.  (Holznagel Dep. Tr. at 59.)

"demotions" in support of his claims.

[2] A "planner" organizes and schedules work at a job site and obtains parts in preparation for upcoming maintenance.  (Holznagel Dep. Tr. at 6.)   Colenburg approached Clayton Holznagel – the planner (and later the project manager) at the Marathon job site – on his very first day, "before [Holznagel] was even able to put his suitcase down," to express interest in becoming a planner.  (Colenburg Dep. Tr. at 142; Holznagel Dep. Tr. at 49-50.)

[3] Huerta is referred to as both a "foreman" and a "scaffold supervisor" in the Motion papers.

Colenburg became upset at Holznagel's decision.  Holznagel previously had informed him that he would be given an opportunity to demonstrate his skills in a leadership role.  (Colenburg Dep. Tr. at 197-200; Holznagel Dep. Tr. at 53-56; Olsen Dep. Tr. at 77.)  He and another Starcon employee, Robert Duffy, had been performing certain supervisor duties for several weeks prior, without pay, in an attempt to show their qualifications for a supervisory position.  (Colenburg Dep. Tr. at 202-03.)  Upon learning that Olsen would temporarily "step up" to Huerta's position, Colenburg angrily confronted Holznagel during a meeting of Starcon employees.  (Holznagel Dep. Tr. at 55-56; Lipschultz Aff. Ex. K.)  Holznagel then suspended Colenburg for two days (including the day of the confrontation) without pay due to his outburst in front of others and warned him that "[a]ny further violations of Starcon's policies will result in further disciplinary action up to, and including, termination of employment."  (Lipschultz Aff. Ex. K.)  Colenburg never mentioned to Holznagel that he believed he was not "stepped up" to Huerta's position because of his race.  (Colenburg Dep. Tr. at 234-35.)

Shortly thereafter, Huerta decided to resign from Starcon and return to his native Texas.  (Lipschultz Aff. Exs. D-E.)  Holznagel contacted Starcon's human-resources department about the vacancy on January 16, 2008.  (Id.)  While he had several candidates in mind for the position, he thought it best to post the position for applications so that it "would not look like" he was "playing favorites."  (Id. Ex. D.)  He informed human resources that, in the interim before a permanent replacement was selected, Colenburg and Duffy could temporarily fill the supervisor position.  (Id. Ex. D.)

The following morning, Holznagel spoke with Colenburg. (Colenburg Dep. Tr. at 230; Holznagel Dep. Tr. at 66-67.) They discussed Colenburg's goals within the company, and Colenburg reiterated his earlier expressed interest in obtaining a planner position. (Id. at 67-68; Thome Aff. Ex. 9.) Holznagel asked Colenburg whether he could accept Olsen as his supervisor, and Colenburg stated that he could. (Colenburg Dep. Tr. at 230; Holznagel Dep. Tr. at 66-67.) Holznagel then selected Olsen as Huerta's replacement. (Lipschultz Aff. Ex. E.) According to Holznagel, he selected Olsen because of his prior military leadership experience, his performance filling in for Huerta, and Colenburg's statement that he preferred to obtain a planner position. (Holznagel Dep. Tr. at 59-60, 96.)[4]

Colenburg then spoke with the on-site safety manager, Rick Boxford. According to Colenburg, Boxford informed him that, in his view, the selection of Olsen for the scaffold supervisor position was an act of "blatant discrimination." (Colenburg Dep. Tr. at 324-26.) Nevertheless, Colenburg did not inform human resources, Holznagel, or any other Starcon manager that he felt he had been discriminated against. Moreover, just a few days later, Colenburg was promoted to the position of scaffold lead and received a

---

[4] Colenburg argues that his conversation with Holznagel did not occur until *after* the decision had been made to promote Olsen. (Mem. in Opp'n at 9-11.) That argument is belied by Colenburg's own deposition testimony. (Colenburg Dep. Tr. at 230 ("Shortly before, I guess, Kris Olsen was given that job, . . . Clayton called me into his office and asked me how would I feel if Kris Olsen was offered that foreman spot permanently.").)

pay raise.  (Lipschultz Aff. Ex. J.)[5]

On April 16, 2008, Colenburg was working with another Starcon employee, who he was training.  He placed a radio call to Boxford asking for a *laminated* copy of the Process Safety Manual for the unit in which he was working.  (Colenburg Dep. Tr. at 273.)  The Process Safety Manual is a pamphlet that explains various safety-related aspects of particular jobs in the refinery.  (Holznagel Dep. Tr. at 106-08; Olsen Dep. Tr. at 38.)  According to Colenburg, he wanted the laminated copy to explain certain safety concerns to the other worker, whose first language was not English.  (Colenburg Dep. Tr. at 272-73.)  Yet, Colenburg had a paper copy of the Process Safety Manual in his possession, which contained the exact same information as the laminated copy – he only wanted the laminated version because it holds up better.  (Colenburg Dep. Tr. at 273-74.)  Moreover, Colenburg knew that a laminated copy was available in a nearby satellite office.  (Holznagel Dep. Tr. at 109; Colenburg Dep. Tr. at 274.)

Boxford was in an office with maintenance foreman Chris Mishkee when Colenburg's radio call came in; Boxford did not have access to his radio, so he allowed Mishkee to respond to the call.  (Holznagel Dep. Tr. at 106-07; Lipschultz Aff. Ex. N.)  Mishkee informed Colenburg that since he already had a paper copy of the Process Safety Manual, he should just "do what you're supposed to do . . . and get to work" and that he

_____

[5] Holznagel testified that, absent the promotion, Colenburg likely would have lost his job because Marathon was asking Starcon to cut maintenance staffing at the refinery.  (Holznagel Dep. Tr. at 74-75.)

(Mishkee) would bring Colenburg a laminated copy later.  (Colenburg Dep. Tr. at 273; Holznagel Dep. Tr. at 106.)  Colenburg then asked Mishkee whether his instructions were coming from Boxford, and Mishkee again repeated (loudly) that Colenburg should get to work.  (Colenburg Dep. Tr. at 273-74.)  Colenburg, in an admittedly raised, disrespectful, and insubordinate tone, responded that Mishkee could not tell him what to do and that he would quit before taking orders from Mishkee.  (Id. at 274-76, 281.)  Mishkee then told Colenburg to meet him in the office, but Colenburg insisted on Mishkee coming out to the job site instead.  (Colenburg Dep. Tr. at 277; Lipschultz Aff. Ex. N.)

Colenburg's radio calls were overheard by several other Starcon employees, including planner Stoney Strickland.  (Holznagel Dep. Tr. at 107; Lipschultz Aff. Ex. N.)  Strickland radioed Holznagel and informed him what had transpired.  (Holznagel Dep. Tr. at 107.)  Olsen and Holznagel spoke with Mishkee, Strickland, and Boxford (who also overheard the call), and then summoned Colenburg to the office.  (Holznagel Dep. Tr. at 107-08; Colenburg Dep. Tr. at 277-80; Lipschultz Aff. Ex. N.)  Olsen informed Colenburg that he was fired for insubordination.  (Colenburg Dep. Tr. at 279-82; Holznagel Dep. Tr. at 117; Olsen Dep. Tr. at 112-16; Lipschultz Aff. Ex. N.)

Colenburg later commenced the instant action against Starcon, alleging violations of the MHRA and the Whistleblowers' Act.  Starcon now moves for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. <u>Celotex</u>, 477 U.S. at 322; <u>Mems v. City of St. Paul, Dep't of Fire & Safety Servs.</u>, 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. <u>Graves v. Ark. Dep't of Fin. & Admin.</u>, 229 F.3d 721, 723 (8th Cir. 2000); <u>Calvit v. Minneapolis Pub. Schs.</u>, 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

### I.   The whistleblower claim

The Court beings its analysis with Count III of the Complaint, which alleges a violation of the Minnesota Whistleblowers' Act. Colenburg asserts that Starcon violated the Act by terminating his employment after he requested, but was denied, the laminated Process Safety Manual. The Court need not linger long on this claim.

The Whistleblowers' Act protects an employee who, in "good faith, reports a violation or suspected violation of any federal or state law." Minn. Stat. § 181.932, subd. 1(a). In order to establish a violation of the statute, therefore, a plaintiff must show, *inter alia*, that he engaged in statutorily protected conduct – in other words, that he reported a

8

violation (or suspected violation) of the law.  E.g., Swanson v. State, No. A08-0553, 2009

WL 671039, at *3 (Minn. Ct. App. Mar. 17, 2009); Gee v. Minn. State Colls. & Univs.,

700 N.W.2d 548, 555 (Minn. Ct. App. 2005).  There is simply no evidence in the record

indicating that Colenburg told Mishkee, Boxford, or any other Starcon employee of a

violation of the law in connection with his radio transmission seeking the laminated

Process Safety Manual.  Indeed, that transmission was nothing more than a request for

information – information that Colenburg admittedly already possessed, just not in

laminated form.  Nothing in the record indicates that Colenburg stated, or even hinted,

that the law would be broken if he did not receive a *laminated* Process Safety Manual.

Only under the most strained interpretation of the evidence could his radio request be

considered a "report" of unlawful activity.[6]

        Because Colenburg has failed to demonstrate that he engaged in statutorily

protected conduct, his whistleblower claim fails as a matter of law.

---

[6] Colenburg claims, in requesting the laminated Process Safety Manual, that he was
reporting a violation of the Employee Right to Know Act, Minn. Stat. § 182.65 *et seq.*, but he
does not specify how he believed that statute was violated.  (Mem. in Opp'n at 21-22.)
Moreover, the paper copy of the Process Safety Manual that Colenburg possessed contained
exactly the same information as the laminated version.  While a plaintiff need not show an actual
violation of the law in order to state a claim under the Whistleblowers' Act, he nevertheless must
have a "good faith" belief that the law has been violated.  E.g., Mahazu v. Becklund Home
Health Care, Inc., No. C8-02-28, 2002 WL 1751280, at *3 (Minn. Ct. App. July 30, 2002).  In
the Court's view, Colenburg cannot have believed, in good faith, that the law was being broken
when he was not provided with a laminated copy of a document he already had.  Nevertheless,
the Court does not rely on this basis to dismiss the whistleblower claim, because "[g]enerally,
whether a report was made in good faith is a question of fact."  Id. at *3 n.1.

## II.      The MHRA reprisal claim[7]

In Count II, Colenburg alleges that (1) he was passed over for promotion to scaffold supervisor and (2) his employment was terminated on account of his complaints of race discrimination.  MHRA reprisal claims are evaluated under the familiar McDonnell Douglas burden-shifting framework.  E.g., Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 548 (Minn. 2001).  Under McDonnell Douglas, a plaintiff must first establish a *prima facie* case of reprisal by proffering evidence that (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) a causal connection exists between the two.  Id.  The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions.  Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 445 (Minn. 1983).  If the defendant does so, the plaintiff must then proffer sufficient evidence to create a genuine issue whether the defendant's given reason is a pretext for reprisal.  Ray v. Miller Meester Adver., Inc., 664 N.W.2d 355, 367 (Minn. Ct. App. 2003).

Here, there is no dispute that Colenburg's failure to obtain the scaffold supervisor position and his termination both were adverse employment actions.  Nevertheless, he cannot establish a *prima facie* case of reprisal with respect to either.

---

[7] Although the MHRA uses the term "reprisal" rather than "retaliation," MHRA claims are analyzed in the same fashion as claims under federal employment statutes like Title VII. See, e.g., Carraher v. Target Corp., Civ. No. 05-2385, 2006 WL 2882345, at *7 n.13 (D. Minn. Oct. 5, 2006) (Kyle, J.), aff'd, 503 F.3d 714 (8th Cir. 2007); Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999).

First, it is not entirely clear that Colenburg engaged in statutorily protected activity. He contends that he complained to Reggie Williams, a Starcon Vice President, and Jeff Sutton, Starcon's human-resources manager, about discriminatory treatment in late 2006 and early 2007. (Colenburg Dep. Tr. at 253-60.) He testified in his deposition that he informed Williams that he (Colenburg) had not received a pay raise while other, white co-workers had. (Colenburg Dep. Tr. at 253-54.) In his brief, he asserts that he "was very detailed and specific in his report[] of racism" to Williams. (Mem. in Opp'n at 42.) Yet, the record contains an e-mail Colenburg sent to Williams addressing this failure to receive a raise, and that e-mail *makes no mention of race whatsoever*. (Lipschultz Aff. Ex. L.)

Unfortunately, this is but one example of many distortions of the record sprinkled throughout Colenburg's brief. He frequently points to complaints allegedly made to various Starcon supervisors, yet for the majority of those so-called complaints, there is no evidence indicating that race was mentioned in any way. For example, Colenburg claims that he complained to Holznagel when he was passed over for the scaffold supervisor position (Mem. in Opp'n at 44), but he admitted in his deposition that he did not mention race at the time. (Colenburg Dep. Tr. at 261 ("That was just more or less me speaking of this being unfair. I didn't say it as – as race, but I did exclaim it as unfair and unjust.").) Similarly, on page 43 of his brief, he asserts that he "complained to Holznagel . . . that he and other people were not being paid for performing lead worker job duties." No citation to the record supporting that assertion, however, is found on page 43. And while

11

Colenburg earlier asserts that he "complained to Holznagel in the fall of 2007 about the fact that [he was] not being paid for the lead man work [he was] performing" (id. at 7-8), the deposition pages cited there to support that assertion nowhere indicate that such complaints implicated race. (See Colenburg Dep. Tr. at 193-96, 199-201.)[8]

The Court does not point out these inaccuracies in an attempt to castigate Colenburg or his counsel. Rather, they are important because complaints do not constitute protected activity for purposes of a retaliation (or reprisal) claim unless they implicate race or some other illegitimate criterion. E.g., Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1028-29 (8th Cir. 2002) (plaintiff's complaints not protected activity where she "did not attribute [the defendant's] failure to give her a raise or a promotion to sex discrimination"); Miller v. Conseco Fin. Servicing Corp., Civ. No. 01-757, 2002 WL 1495217, at *8 (D. Minn. July 11, 2002) (Frank, J.) (same). Hence, it is not at all clear that Colenburg has satisfied even the first prong of his *prima facie* case.

In any event, assuming *arguendo* that his alleged complaints amounted to statutorily protected conduct, Colenburg has failed to show any connection between the complaints and either the failure to promote or his termination. The complaints occurred well before either of the alleged adverse employment actions (both of which occurred in 2008), undermining any causal connection. See, e.g., Backman v. United States Postal

---

[8] Colenburg also points to inappropriate comments allegedly directed to a co-worker, Lio Hernandez, as well as complaints Hernandez purportedly made about them. (Mem. in Opp'n at 5.) For example, he claims that Brandon Wallheimer, his first supervisor, told Hernandez, "Niggers need to go back to Africa." (Id.) However, the cited pages of Hernandez's deposition transcript contain no such testimony, and in fact make no mention of Wallheimer at all.

Serv., Civ. No. 04-3175, 2005 WL 2671534, at *8 (D. Minn. Oct. 3, 2005) (Kyle, J.)

("[A]n extended time lapse between the . . . protected activity and the adverse

employment action weakens the inference of retaliatory intent.") (internal quotation

marks omitted); Evanoff v. Minneapolis Pub. Sch., Special Sch. Dist. #1, No. C6-01-471,

2001 WL 950049, at *1 (Minn. Ct. App. Aug. 21, 2001) ("Generally, if the adverse action

occurs more than one year after the report, [it] is considered too remote to establish a

causal connection.").  Colenburg also ignores that he was promoted from scaffold B

builder to scaffold A builder, with an increase in pay, in March 2007, and was later

promoted again to scaffold lead – in an effort by Holznagel to save his job – in January

2008.  Both promotions occurred *after* his alleged complaints to Williams and Sutton.

This is obviously inconsistent with any intent on Starcon's part to retaliate against

Colenburg for his complaints.  Lastly, Colenburg has proffered no evidence indicating

that the decision-makers vis-a-vis his failed promotion (Holznagel and Huerta) and his

termination (Holznagel and Olsen) were aware of his complaints at the relevant times.

"[T]o establish a *prima facie* case of retaliation, the plaintiff must show that the decision-

makers responsible for the adverse employment action knew about the plaintiff's

protected activity."  White v. Ark. Dep't of Health & Human Servs., No. 5:04CV0318,

2006 WL 229896, at *9 (E.D. Ark. Jan. 30, 2006); accord, e.g., Jackson v. United Parcel

Serv., Inc., 548 F.3d 1137, 1143 (8th Cir. 2008).

Simply put, Colenburg has failed to proffer evidence linking his alleged complaints to the adverse employment actions and, accordingly, he has failed to state a *prima facie* case of reprisal in violation of the MHRA.

Nor has Colenburg proffered sufficient evidence to demonstrate that the reasons proffered by Starcon for the adverse employment actions were a pretext for retaliation. He makes no attempt to undermine Starcon's proffered reason for hiring Olsen for the scaffold supervisor position: his prior military leadership and experience, his performance in the short time he filled in for Huerta, and Colenburg's expressed desire to obtain a planner position. Indeed, he simply directs the Court to the pretext portion of his brief regarding the whistleblower claim (pages 28-32), which addresses only Colenburg's termination, not his failure to obtain the scaffold supervisor position. And as for his termination, Colenburg *admitted in his deposition* that he did not view the termination of his employment as retaliatory. (Colenburg Dep. Tr. at 284.) Given these and the other facts recited above, Colenburg has failed to show that there is a genuine issue that Starcon retaliated against him.[9]

---

[9] Colenburg also claims that he was subjected to hostile treatment by Wallheimer in 2006 in retaliation for complaints about discriminatory treatment. (Mem. in Opp'n at 45.) The Court declines to consider that assertion, as it is untimely. See Minn. Stat. § 363A.28, subd. 3 (one-year statute of limitations for MHRA claims); Dobesh v. CBS Broad., Inc., No. A03-978, 2004 WL 771725, at *3 (Minn. Ct. App. Apr. 13, 2004) (reprisal claim must be brought within one year of allegedly retaliatory conduct). In any event, the only "adverse" employment action Colenburg attributes to Wallheimer is being "assigned to less desirable jobs and/or [being] segregated" by him. (Mem. in Opp'n at 45.) Undesirable work assignments and "unpalatable transfers" are generally not actionable. Spencer v. State, Dep't of Corr., No. A07-0462, 2008 WL 668259, at *4 (Minn. Ct. App. Mar. 11, 2008) (citing Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997)).

## III.  The discrimination claim

In Count I, Colenburg asserts that Starcon discriminated against him on account of his race.  The exact contours of this claim are not clear, however.  His brief is suffused with vague and amorphous claims of "unfair treatment" that are ill-defined and undeveloped in the record.  Nevertheless, it appears that Colenburg contends he was discriminated against in three primary ways: (1) his work environment was racially hostile; (2) he was denied the promotion to scaffold supervisor because of his race; and (3) his employment was terminated on account of his race.  None of these assertions passes muster.

### A.  Hostile work environment

A plaintiff alleging an MHRA claim based on a racially hostile work environment must establish that (1) he is a member of a protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based upon his race, and (4) the harassment affected a term, condition, or privilege of employment.  Frieler v. Carlson Mktg. Group, Inc., 751 N.W.2d 558, 571 n.11 (Minn. 2008).  Such a claim is actionable only if the conduct at issue is "so severe or pervasive as to alter the conditions of the [plaintiff's] employment and create an abusive working environment."  Id. (internal quotation marks omitted).  This is because employment-discrimination statutes are not intended to "create a general civility code."  Shaver v. Indep. Stave Co., 350 F.3d 716, 721 (8th Cir. 2003).  "Conduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law."  Id.

A court must evaluate the totality of the circumstances in deciding whether a plaintiff's work environment is sufficiently hostile to survive summary judgment.  Goins v. W. Group, 635 N.W.2d 717, 725 (Minn. 2001).  Bearing on that question are "the frequency of the . . . conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Arraleh v. County of Ramsey, 461 F.3d 967, 979 (8th Cir. 2006).

In support of the claim here, Colenburg points to a string of racially derogatory comments made by his first supervisor, Wallheimer; the fact that Wallheimer gave him less-desirable work assignments; and the fact that Olsen used the word "nigger" when talking to other white employees.  (Mem. in Opp'n at 38-39.)  But a hostile work environment exists only where "the conduct complained of [is] extreme in nature and not merely rude or unpleasant."  Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 618 (8th Cir. 2007); accord Gipson v. KAS Snacktime Co., 171 F.3d 574, 579 (8th Cir. 1999) (claim limited to "extreme work conditions").  This is a "demanding" standard, Arraleh, 461 F.3d at 979, and one that Colenburg has failed to meet here.

While the use of racially derogatory terms, including the word "nigger," is undoubtedly inappropriate and offensive, there is no evidence that the challenged comments were in any way physically threatening.  Moreover, the record is devoid of evidence that Wallheimer, Olsen, or any other Starcon employee ever called Colenburg a "nigger" to his face or used any other racially insensitive terms in his presence.  Indeed,

Colenburg admits that he never heard "anyone use any racial epithet or racial word" during his employment and that he only learned of the alleged comments second-hand. (Colenburg Dep. Tr. at 246.)  See, e.g., Singletary v. Mo. Dep't of Corrs., 423 F.3d 886, 893 (8th Cir. 2005) (noting that "racial slurs alone do not render a work environment hostile as a matter of law"; fact that plaintiff learned second-hand that co-workers and supervisors had referred to him as a "nigger" several times insufficient to support hostile-environment claim).  And, the allegedly derogatory comments were spread out over more than two years of employment.  See Bainbridge v. Loffredo Gardens, Inc., 378 F.3d 756, 759-60 (8th Cir. 2004) (no hostile work environment from use of terms "Jap," "nip," and "gook" for Asians approximately once a month over two years of employment).

In addition, the evidence does not support the conclusion that the comments affected Colenburg's work performance – indeed, he was consistently viewed as a hard-working (if sometimes disrespectful) employee who was thrice promoted and received consistent pay raises.  While he contends that he repeatedly raised concerns about race-based comments and mistreatment, his evidence of doing so is meager.  (See supra at 11-12.)  Notably, Starcon's employee handbook prohibits harassment based on race and requires an employee believing that he has been so harassed to "report the situation immediately to [his] Supervisor and the Human Resources Department."  (Lipschultz Aff. Ex. H.)  Colenburg testified that he was aware of and understood that policy during his tenure with the company, although he later backtracked from that testimony.  (Colenburg Dep. Tr. at 133-35.)  Nevertheless, if the environment were as hostile as Colenburg

contends, one would expect there to be a greater showing in the record that Colenburg complained about such hostility. The absence of such evidence is telling.

Finally, it is undisputed that two days after he was fired, Colenburg e-mailed Starcon's human-resources department and asked to be reinstated to his prior position. (Thome Aff. Ex. 14.) In the Court's view, it is antithetical for a former employee to claim, on one hand, that his work environment was so "permeated with discriminatory intimidation, ridicule, and insult" as to constitute a hostile work environment, <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993), while, on the other hand, seeking to re-obtain employment in that same environment just two days after his termination.

Under these circumstances, the Court concludes that Colenburg has failed to establish that the alleged harassment was sufficiently "severe or pervasive" to support a hostile-work-environment claim.

**B.     Failure to promote**

A plaintiff alleging discrimination in violation of the MHRA can prove his claim in one of two ways. Typically, a plaintiff seeks to prove his claim through circumstantial evidence. In that situation, the <u>McDonnell Douglas</u> burden-shifting framework applies. <u>See, e.g.</u>, <u>Ramlet v. E.F. Johnson Co.</u>, 464 F. Supp. 2d 854, 859-61 (D. Minn. 2006) (Kyle, J.), <u>aff'd</u>, 507 F.3d 1149 (8th Cir. 2007); <u>Malknecht v. Indep. Sch. Dist. No. 833</u>, No. A07-0250, 2008 WL 1799768, at *2 (Minn. Ct. App. Apr. 22, 2008). "But when a plaintiff [proffers] direct evidence of discriminat[ion], it is not necessary to employ the <u>McDonnell Douglas</u> analysis used in indirect-evidence circumstances." <u>Id.</u>

Here, Colenburg argues that he has direct evidence of discrimination with respect to the failure to promote. (Mem. in Opp'n at 34.) But much of the evidence he cites – such as working additional duties without pay – lacks any obvious racial connotation. Direct evidence is "evidence that establishes a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006); accord, e.g., Malknecht, 2008 WL 1799768, at *2. Facially race-neutral evidence, therefore, is not direct evidence. Twymon, 462 F.3d at 934. Colenburg also cites several race-based comments by Wallheimer and Olsen, but neither was involved in the decision to pass him over for promotion to the scaffold supervisor position. Statements by non-decisionmakers also are not direct evidence. Id. at 933; Diez v. Minn. Mining & Mfg., 564 N.W.2d 575, 579 (Minn. Ct. App. 1997).[10]

Simply put, Colenburg has offered no direct evidence of discrimination vis-a-vis the failure to promote. Accordingly, the Court will evaluate this claim in accordance with McDonnell Douglas. Under that framework, as discussed more fully above, a court typically begins its analysis by determining whether the plaintiff has stated a *prima facie*

---

[10] Colenburg also points to so-called "acknowledgments" by Boxford and Williams that Starcon had discriminated against him, including with respect to the failure to promote. (Mem. in Opp'n at 35.) But "a statement by a company's director of human resources that he was concerned that a plaintiff's termination might violate . . . discrimination laws [is] a stray remark," which "cannot serve as direct evidence of discrimination." Diez, 564 N.W.2d at 579 (citing Bashara v. Black Hills Corp., 26 F.3d 820, 824 (8th Cir. 1994)).

case of discrimination.  But when an employer has proffered the legitimate, non-discriminatory reason required at step two of the <u>McDonnell Douglas</u> analysis, the Court may skip the *prima facie* case and move directly to the question of discrimination *vel non*. <u>E.g.</u>, <u>United States Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715 (1983); <u>Riser v. Target Corp.</u>, 458 F.3d 817, 820-21 (8th Cir. 2006).  Here, Starcon has proffered a legitimate, non-discriminatory reason for the failure to promote:  Olsen's prior military leadership experience, his performance in the short time he filled in for Huerta, and Colenburg's desire to obtain a planner position.  The Court, therefore, moves directly to the last step of the <u>McDonnell Douglas</u> analysis.

At that third and final step, in the Court's view, Colenburg has not proffered sufficient evidence to create a genuine issue that discriminatory reasons motivated Starcon's selection of Olsen for the scaffold supervisor position.  While Colenburg indisputably had more scaffold experience and had worked for Starcon for a longer period of time than Olsen, he makes little effort to rebut Starcon's contention that Olsen had demonstrated leadership experience from his time serving in the Army, a qualification obviously important for a supervisory position.  "Although an employer's selection of a less qualified candidate can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual, it is the employer's role to identify those strengths that constitute the best qualified applicant."  <u>Arraleh</u>, 461 F.3d at 976 (internal quotation marks and alterations omitted).  Moreover, Holznagel testified that he opted to promote Olsen only after asking Colenburg how he felt about it and whether he remained

interested in ultimately obtaining a different position, planner – that testimony is corroborated by Colenburg. (<u>See</u> Colenburg Dep. Tr. at 230.) And, Colenburg fails to recognize that just days after Olsen was given the scaffold supervisor position, he was promoted by Holznagel – *the same decision-maker* – to scaffold lead and given a pay raise. <u>See</u> <u>Arraleh</u>, 461 F.3d at 976 ("[T]here is a strong inference that discrimination was not a motivating factor if the same person hired and fired the plaintiff within a relatively short period of time.") (citation omitted).

Federal courts do not sit as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." <u>Id.</u> at 976. To borrow language from <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 781 (8th Cir. 1995), "it is clear to the court that this lawsuit is less about possible . . . discrimination than it is about whether [Starcon's] decision to [promote Olsen], as opposed to [Colenburg], was fundamentally unfair or arbitrary."

## C.    Termination

To state a *prima facie* case of discriminatory termination, Colenburg must show that he (1) is a member of a protected class, (2) was qualified for the position he was performing, (3) was discharged, and (4) was replaced by a non-member of the protected class or other similarly situated nonprotected employees were not discharged for nearly identical behavior. <u>Swanigan v. W. Airlines, Inc.</u>, 396 N.W.2d 607, 612 (Minn. Ct. App.

1986).[11] Colenburg proffers no evidence regarding who replaced him after he was terminated, so he can satisfy the fourth element of his *prima facie* case only by showing that a similarly situated, non-African American employee was not discharged for the same behavior.  His claim fails on this fourth prong.

Colenburg notes that several other Starcon employees used profanity, yelled, and used epithets in the workplace without being terminated.  (Mem. in Opp'n at 30.)  But there is no evidence in the record indicating that any such profane or inappropriate statements *were directed at supervisors*, which was the proffered basis for Colenburg's termination.  Hence, he has failed to show that other employees "engaged in the same conduct" without getting fired.  Hervey v. County of Koochiching, 527 F.3d 711, 720 (8th Cir. 2008).  Colenburg also overlooks that he had been warned just a few months earlier about his behavior and told that any further misconduct might result in the termination of his employment.  He has proffered no evidence that other Starcon

---

[11] The McDonnell Douglas framework is the appropriate method to evaluate Colenburg's discriminatory-discharge claim because he has no direct evidence of discrimination with respect to his discharge.  The closest he comes to direct evidence is a statement by Olsen shortly after the meeting in which he (Colenburg) was terminated.  He claims that Olsen walked out of the office, pointed at James Andrews – another African-American – and said, "That nigger's next." (Colenburg Dep. Tr. at 29, 245, 280.)  The problem is that Colenburg did not overhear this statement himself; rather, it was related to him by another Starcon employee, Robert Duffy.  (Id.) While Olsen's alleged statement is an admission that may be considered under Federal Rule of Evidence 801(d)(2), Duffy's is not – it is inadmissible hearsay.  See, e.g., Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 923 (8th Cir. 2004) (plaintiff "cannot rely on hearsay to avoid summary judgment"); Bersch v. Rgnonti & Assocs., Inc., 584 N.W.2d 783, 788 (Minn. Ct. App. 1998) (trial court "must disregard inadmissible hearsay evidence on a motion for summary judgment").  Without Duffy's hearsay, the Court cannot consider Olsen's allegedly discriminatory statement because Colenburg offers no other evidence of it.

employees allegedly making inappropriate comments had similar employment histories or warnings.  Hence, he has not identified any "similarly situated" employees treated differently.  See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (granting summary judgment for employer because plaintiff's previous policy violations "render[ed] her unique" from other employees).

Regardless, the Court would reach the same result even if Colenburg had stated a *prima facie* case, because he has failed to create a genuine issue whether Starcon's proffered reason for his termination was pretextual.  Tellingly, when asked at his deposition whether he thought race played a part in his discharge, Colenburg testified, "I believe that everything that led up until that event, some of it was racially motivated.  *I don't believe that day when Chris Mishkee called me back and Kris Olsen fired me, he fired me because I was black, no*."  (Colenburg Dep. Tr. at 282 (emphasis added).)  Moreover, two days after his termination, he submitted an e-mail to Starcon's human-resources department asking for his job back.  (Thome Aff. Ex. 14.)  Nowhere in that e-mail did Colenburg mention or even intimate that his employment had been terminated, in his view, due to his race.  For this and all the other reasons discussed above, the Court determines that Colenburg has failed to create a genuine issue whether his employment was terminated on account of his race rather than the reason proffered by Starcon: insubordination.[12]

---

[12] As noted in Manson v. Little Rock Newspapers, Inc., 42 F. Supp. 2d 856, 867 (E.D. Ark. 1999), aff'd, 200 F.3d 1172 (8th Cir. 2000), insubordination "will get you 'fired' almost

## IV.     The counterclaims

In its counterclaims, Starcon alleges that Colenburg (1) breached the terms of the relocation agreement by failing to repay the $12,000 he received for moving expenses and (2) was unjustly enriched as a result.  There is no dispute that Colenburg entered into a valid agreement with Starcon pursuant to which he received $12,000 in moving expenses. The agreement expressly provided that, in the event he did not remain employed with Starcon at the Marathon site for two years, he would be liable to Starcon for those moving expenses.  (Lipschultz Aff. Ex. G.)[13]  There is also no dispute that Colenburg failed to remain employed for two years at the Marathon site.  Accordingly, Starcon is entitled to judgment against him for $12,000.

The only rebuttal offered by Colenburg is that Starcon precipitated his breach of the relocation agreement "when it violated [his] rights as an employee and made his work place hostile.  [Starcon] cannot be permitted to use its contract to subject employees to an intolerable and unlawful environment and then terminate them when they complain." (Mem. in Opp'n at 48.)  Because the Court has already rejected the hostile-work-environment claim, this argument lacks merit.

---

anywhere."

[13] Specifically, Colenburg "irrevocably authorize[d] and empower[ed] any attorney-at-law to appear in any court of record and to confess judgment against" him for the $12,000. (Lipschultz Aff. Ex. G.)

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 14) is

**GRANTED**.  Plaintiff's Complaint (attached to Doc. No. 1) is **DISMISSED WITH**

**PREJUDICE**, and Defendant is entitled to Judgment of $12,000 against Plaintiff on its

Counterclaims (Doc. No. 4).

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: May 29, 2009                                       s/Richard H. Kyle_____
                                                                        RICHARD H. KYLE
                                                                        United States District Judge